**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID GOINGS, LEWINE BOUCHER-GOINGS and JUANITA GOINGS, | ‖ | |
| Plaintiffs, | ‖ | No. 06-CV-2063-LRR |
| vs. | ‖ | |
| CHICKASAW COUNTY, IOWA; MARTIN LARSEN, Individually and in His Official Capacity; and TODD MILLER, Individually and in His Official Capacity, | ‖ | **ORDER** |
| Defendants. | ‖ | |

————————————

*TABLE OF CONTENTS*

I.    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

II.   **RELEVANT PRIOR PROCEEDINGS** . . . . . . . . . . . . . . . . . . . . . . . . . **3**

III.  **JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

IV.  **LEGAL STANDARD FOR SUMMARY JUDGMENT** . . . . . . . . . . . . . . . **5**

V.   **FINDINGS OF FACT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
    *A.*   *Players* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
    *B.*   *Plaintiffs' Prior Encounters with Law Enforcement and DHS* . . . . . **8**
        *1.*   *2001* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
        *2.*   *2002* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
            *a.*   *Arrest and conviction for manufacturing marijuana* . . . **8**
            *b.*   *DHS investigation* . . . . . . . . . . . . . . . . . . . . . . . . . **9**
        *3.*   *2004* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
    *C.*   *David Goings's Firing from the Hospital* . . . . . . . . . . . . . . . . . . **10**
    *D.*   *Events Giving Rise to the Instant Lawsuit* . . . . . . . . . . . . . . . . . . **10**
        *1.*   *Schultz complains to Sheriff Larsen* . . . . . . . . . . . . . . . . **10**
        *2.*   *Sheriff Larsen reports to DHS and Chief Deputy Miller* . . . . **11**
        *3.*   *Investigator Troyna investigates* . . . . . . . . . . . . . . . . . . . **12**

|  |  | *a.* | *At the DHS office* . . . . . . . . . . . . . . . . . . . . . . . | *12* |
|  |  | *b.* | *At the schools* . . . . . . . . . . . . . . . . . . . . . . . . | *13* |
|  |  | *c.* | *At the Farmstead* . . . . . . . . . . . . . . . . . . . . . . | *13* |
|  |  |  | *i.* *Conversation outside the farmhouse* . . . . . . . | *13* |
|  |  |  | *ii.* *Search of farmhouse* . . . . . . . . . . . . . . . . | *14* |
|  |  |  | *iii.* *Search of grounds* . . . . . . . . . . . . . . . . . | *15* |
|  |  | *d.* | *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . | *16* |
|  | *4.* | *Chief Deputy Miller returns to destroy the marijuana on Schultz's property* . . . . . . . . . . . . . . . . . . . . . . . | *16* |
|  | *5.* | *David Goings returns to the Farmstead* . . . . . . . . . . . . . | *17* |
|  | *6.* | *David Goings is arrested* . . . . . . . . . . . . . . . . . . . . | *17* |
|  | *7.* | *David Goings is booked* . . . . . . . . . . . . . . . . . . . . | *19* |
| *E.* | *State Court Proceedings* . . . . . . . . . . . . . . . . . . . . . . . . . | *19* |
| **VI.** | **ARGUMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **23** |
| **VII.** | **JUDICIAL ESTOPPEL** . . . . . . . . . . . . . . . . . . . . . . . . . . . | **24** |
| **VIII.** | **COUNT I:  PLAINTIFFS' § 1983 CLAIMS** . . . . . . . . . . . . . . . . | **26** |
| *A.* | *Summary of Argument* . . . . . . . . . . . . . . . . . . . . . . . . . . | *26* |
| *B.* | *Consent* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *27* |
| *C.* | **Heck v. Humphrey** . . . . . . . . . . . . . . . . . . . . . . . . . . | *31* |
| *D.* | *Remaining Arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . | *33* |
| *E.* | *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *33* |
| **IX.** | **COUNTS II, III AND IV:  PLAINTIFFS' STATE LAW CLAIMS** . . . . . | **34** |
| *A.* | *Iowa Code § 670.5* . . . . . . . . . . . . . . . . . . . . . . . . . . . | *34* |
|  | *1.* | *Plain language* . . . . . . . . . . . . . . . . . . . . . . . . . | *34* |
|  | *2.* | *State court decisions* . . . . . . . . . . . . . . . . . . . . . . | *36* |
|  | *3.* | *Is Iowa Code section 670.5 constitutional?* . . . . . . . . . . | *38* |
|  |  | *a.* *Fourteenth Amendment* . . . . . . . . . . . . . . . . | *38* |
|  |  | *b.* *No independent and adequate state grounds* . . . . . | *40* |
|  |  | *c.* *Section 670.5 is constitutional* . . . . . . . . . . . | *41* |
|  | *4.* | *No substantial compliance* . . . . . . . . . . . . . . . . . . . | *42* |
|  | *5.* | *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . | *42* |
| *B.* | *Remaining Arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . | *42* |
|  | *1.* | *False arrest* . . . . . . . . . . . . . . . . . . . . . . . . . . | *42* |
|  | *2.* | *Malicious prosecution* . . . . . . . . . . . . . . . . . . . . . | *44* |
| **X.** | **DISPOSITION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **44** |

# I. INTRODUCTION

The matter before the court is the Motion for Summary Judgment ("Motion") (docket no. 24), which was filed by Defendants Chickasaw County, Iowa; Martin Larsen; and Todd Miller.

# II. RELEVANT PRIOR PROCEEDINGS

On September 8, 2006, Plaintiffs David Goings, Lewine Boucher-Goings and Juanita Goings filed a four-count Complaint against Defendants.[1] Plaintiffs allege one violation of federal law and three state-law torts.

In Count I, Plaintiffs allege that Defendants violated 42 U.S.C. § 1983 when they infringed upon Plaintiffs' federal constitutional rights against unreasonable searches and seizures.[2] Count I has four parts.[3] First, Plaintiffs allege that Defendants "conducted a search through the pretext of investigating a false child abuse complaint, which they knew

---

[1] Plaintiffs also sued the City of Nashua, Iowa ("Nashua"). The court later dismissed Nashua. *See* Order (docket no. 65), *passim*.

[2] Plaintiffs repeatedly state that Defendants violated 42 U.S.C. § 1983 when they infringed upon Plaintiffs' state constitutional rights against unreasonable searches and seizures. Complaint (docket no. 1), at ¶¶ 19 and 26. The parties do not address such statements, which the court presumes are intended to invoke Article I, Section 8 of the Iowa Constitution. Any such § 1983 claims would clearly fail. To state a claim under 42 U.S.C. § 1983, Plaintiffs "must allege the violation of a right secured by the Constitution and laws *of the United States* . . . ." *West v. Atkins*, 487 U.S. 42, 48 (1988) (emphasis added); *see Chambers v. Gilmer*, 221 F. App'x 469, 470 (8th Cir. 2007) (per curiam) (dismissing 42 U.S.C. § 1983 that was predicated on a violation of a state statute). Violations of state constitutional rights are not "violation[s] of right[s] secured by the Constitution and laws of the United States." *See, e.g., Edwards v. County of San Diego*, 124 F. App'x 547, 548-49 (9th Cir. 2005) (affirming dismissal of § 1983 claim predicated upon violation of provision of California Constitution, "because § 1983 only allows relief for violations of federal, rather than state, rights"); *Flynn v. Sandahl*, 58 F.3d 283, 290 (7th Cir. 1995) (affirming dismissal of § 1983 claim predicated upon violation of provision of Illinois Constitution).

[3] The Complaint is not a model of clarity.

to be false, without a warrant and without probable cause, contrary to the Fourth and Fourteenth Amendment [sic] of the United States Constitution" ("Unreasonable Search Claim"). Complaint (docket no. 1), at ¶ 19(a). Second, Plaintiffs allege that Defendants "seized and kept items of personal property during the search, contrary to the Fourth and the Fourteenth Amendment [sic] of the United States Constitution" ("Unreasonable Seizure of Property Claim"). *Id.* at ¶ 19(b). Third, David Goings alleges that Defendants "arrest[ed] him without probably [sic] to the Fourth and Fourteen [sic] Amendment to the United States Constitution" ("Unreasonable Seizure of Person Claim"). *Id.* at ¶ 20. Fourth, David Goings alleges that Defendants "us[ed] excessive force against [him] in the course of his arrest, causing physical injury" ("Excessive Force Claim"). *Id.* at ¶ 21.

In Count II, Plaintiffs allege defamation against Defendants under the Iowa common law. Plaintiffs allege that Defendants "knowingly started and spread false rumors about the Plaintiffs being involved in drug manufacture in their residence," *id.* at ¶ 28, and "knowingly communicated these defamatory statements to the [sic] members of the law enforcement agencies, including other Chickasaw County deputies, an officer of the Nashua City Police[,] a State Agent and the Department of Human Services, as well as members of the general public," *id.* at ¶ 29. Plaintiffs allege that Defendants' actions "were either intentional or done with reckless indifference to the rights of Plaintiffs . . . ." *Id.* at ¶ 30.

In Count III, David Goings alleges false arrest against Defendants under the Iowa common law. David Goings claims that Defendants "detained or restrained [him] against his will," *id.* at ¶ 35, and such "detention or restraint amounted to a false arrest, since it was an unlawful restraint of [his] personal liberty of freedom of movement," *id.* at ¶ 36.

In Count IV, David Goings alleges malicious prosecution against Defendants under the Iowa common law. David Goings claims he was "prosecuted in a criminal proceeding in Chickasaw County District Court," *id.* at ¶ 42, Defendants caused the prosecution and

"[t]he prosecution ended favorably for [David Goings]," *id.* at ¶ 44. David Goings alleges that Defendants initiated the prosecution without probable cause and with malice.

On December 22, 2006, Defendants filed an Answer, in which they denied the substance of the Complaint. On June 22, 2007, Defendants filed an Amended Answer.

On July 2, 2007, Defendants filed the Motion. On August 23, 2007, Plaintiffs filed a Resistance.[4] On August 30, 2007, Defendants filed a Reply.

On December 6, 2007, the court held a hearing on the Motion. Attorney Judith M. O'Donohoe represented Plaintiffs. Attorney Carlton G. Salmons represented Defendants. The matter is fully submitted and ready for decision.

## III. JURISDICTION

The court has federal question jurisdiction over Count I and supplementary jurisdiction over Counts II, III and IV. The court has federal question jurisdiction over Count I, because Plaintiffs contend that Defendants violated 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). The court has supplementary jurisdiction over Counts II, III and IV, because these claims are so related to Count I that they form part of the same case or controversy. *See id.* § 1367(a) ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action with such original jurisdiction that they form part of the same case or controversy . . . ."). *But see id.* § 1367(c) (granting district court discretion to decline to exercise supplemental jurisdiction over state law claims under certain circumstances).

## IV. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the record shows that "there is no genuine issue

---

[4] On August 29, 2007, Plaintiffs filed a Request to Supplement Plaintiffs' Appendix in Resistance to Motion for Summary Judgment. On September 14, 2007, Plaintiffs filed a Request for Second Supplement to Plaintiffs' Appendix in Resistance to Motion for Summary Judgment. On October 24, 2007, the court granted both requests.

as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it is a fact that "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)); *see also Scott v. Harris*, 127 S. Ct. 1769, 1775 (2007) (restating same principles and remarking that "[i]n qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts"). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 127 S. Ct. at 1776.

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see, e.g., Baum v. Helget Gas Prods., Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for

the nonmoving party." *Anderson*, 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## V. FINDINGS OF FACT

When viewed in the light most favorable to Plaintiffs and affording them all reasonable inferences, the material facts are these:[5]

### A. Players

Martin Larsen ("Sheriff Larsen") is the Sheriff of Chickasaw County, Iowa ("Chickasaw County"). Todd Miller ("Chief Deputy Miller") is the Chief Deputy Sheriff of Chickasaw County.

Juanita Goings owns a farmstead ("Farmstead") at 1266 270th Street in Nashua, Iowa. The Farmstead consists of a farmhouse, outbuildings and approximately five acres of land. Juanita Goings has lived on the Farmstead for over sixty years.

---

[5] The court notes that Plaintiffs violated the Local Rules in at least two respects. First, Plaintiffs impermissibly combined their Local Rule 56.1.b.2 response to the moving party's statement of material facts and their Local Rule 56.1.b.3 statement of additional material facts into one document, a "Response to Defendants' Statements of Material Facts Pursuant to Local Rule 56.1(b)2 [sic] and Statement of Plaintiffs' Additional Material Facts Pursuant to Local Rule 56.1(b)3 [sic]" (docket no. 41-2). Second, such document repeatedly fails to properly respond to portions of Defendants' Material Fact Statement (docket no. 24-2) with proper citations to admissible evidence in the record. Because Plaintiffs' claims at issue in the Motion lack merit, the court need not decide whether the court should deem as admitted all of Defendants' Material Fact Statement (docket no. 24-2). *See* LR 56.1.b.

The relevancy of some of the facts may not be readily apparent to the reader of the instant Order. Some of the facts are only relevant to alternative legal issues that the court does not address here. The court presents these facts for the sake of completeness and to facilitate any appellate review. *See, e.g., Lee v. Spellings*, 447 F.3d 1087, 1088 (8th Cir. 2006) (stating that an appellate court may affirm on any basis urged in the district court).

Juanita Goings has two adult children: Lewine Boucher-Goings[6] and David Goings. Lewine Boucher-Goings and her two children have lived at the Farmstead since 1998. David Goings moved to the Farmstead in 1990.

Terry Rice ("Rice") is David Goings's long-term partner. Rice resides at 324 Summit Avenue in Waterloo, Iowa.

Leo Schultz ("Schultz") owns land that adjoins the southern boundary of the Farmstead.

### B. Plaintiffs' Prior Encounters with Law Enforcement and DHS

### 1.   2001

In 2001, David Goings was living at the Farmstead and working as a nurse at the Floyd County Memorial Hospital ("Hospital") in nearby Charles City, Iowa. Schultz informed the Chickasaw County Sheriff's Office ("Office") that David Goings was growing marijuana in the vicinity of the Farmstead. Chief Deputy Miller questioned David Goings, and David Goings denied any involvement. David Goings was not charged with any crimes.

### 2.   2002

### a.   Arrest and conviction for manufacturing marijuana

In 2002, the Office received a tip from a confidential informant that there was a marijuana growing operation in the vicinity of the Farmstead. The Office also received information that David Goings was purchasing excessive amounts of cold medications that contained pseudoephedrine. Pseudoephedrine is commonly used to manufacture methamphetamine. Based upon this information, the Office obtained a warrant from a state court judge to search the Farmstead.

---

[6] Lewine Boucher-Goings refers to herself in her deposition and affidavit as "Lewine Goings-Boucher." The court refers to this plaintiff as the caption of the Complaint lists her.

8

When law enforcement officers executed the search warrant, they found a marijuana manufacturing operation in the basement of the farmhouse. David Goings eventually pled guilty to Possession with Intent to Deliver Marijuana, in violation of Iowa Code section 124.401(1) (2001).

### b.    DHS investigation

Upon learning of David Goings' arrest for growing marijuana inside the farmhouse, the Iowa Department of Human Services ("DHS") investigated the welfare of Lewine Boucher-Goings's children. In December of 2002, DHS issued a "founded child abuse report" as to David Goings and Lewine Boucher-Goings. In such report, DHS determined that David Goings and Lewine Boucher-Goings were abusing Lewine Boucher-Goings's children, in part because they were exposing the children to the manufacturing of illegal narcotics.

### 3.    2004

On June 26, 2004, David Goings called Shane Stillions, a patient whom David Goings had recently met at the Hospital. David Goings offered Stillions $200.00, food and drink, time in a hot tub and transportation if Stillions would have sex with a "clean and disease free" Rice while David Goings watched. Def. App. at 360.[7] David Goings offered to pay Stillions a "tip" if Stillions was "good." *Id.* David Goings also told Stillions that he could smoke "weed." *Id.*[8]

On July 16, 2004, David Goings was charged in the Iowa District Court for Floyd County with Pandering, in violation of Iowa Code section 725.3(1) (2003). On

---

[7] The Charles City Police Department taped and transcribed the phone conversation. The parties do not contest the accuracy or admissibility of the transcription.

[8] Defendants contend that David Goings offered Stillions "weed" to have sex with Rice. The court has reviewed the transcript of the phone conversation and finds that the conversation could be interpreted either way. Accordingly, the court presents the conversation in the light most favorable to Plaintiffs.

December 6, 2004, David Goings pled guilty to Prostitution, in violation of Iowa Code section 725.1.

## C. *David Goings's Firing from the Hospital*

On July 22, 2004, the Hospital fired David Goings upon learning that he had been charged with Pandering. David Goings began working as a landscaper in Waterloo. He also began delivering flowers and vegetables from a family garden on the Farmstead to restaurants in Waterloo.

## D. *Events Giving Rise to the Instant Lawsuit*

### 1. *Schultz complains to Sheriff Larsen*

On September 3, 2004, Schultz told Sheriff Larsen that "there was definitely more marijuana being grown" in the vicinity of the Farmstead. Def. App. at 294.[9] Schultz did

_____

[9] David Goings denies that Schultz made this statement to Sheriff Larsen. Both Sheriff Larsen and Schultz, however, testified to the statement. In an attempt to contradict such testimony, Plaintiffs procured affidavits from Gina McClintock and Jerry Koerber. The court disregards such affidavits, however, because they are plainly inadmissible.

McClintock testified in her affidavit that she is an employee of Elwood, O'Donohoe, Stochl, Braun & Churbuck, the law firm that represents Plaintiffs. McClintock stated that she called Sylvia Welter, a woman who was allegedly present when Larsen and Schultz were talking. McClintock testified that Welter

> indicated that she does not remember any conversation during this time that included the Goings family or any marijuana and furthermore that there was no reason for any of the Goings'[s] family to be mentioned during this time as this situation had nothing to do with them.

Pl. App. at 424-425. McClintock's testimony about what Welter said is inadmissible hearsay. Fed. R. Evid. 802.

Koerber testified in his affidavit that, on August 22, 2007, Plaintiffs' attorney, Ms. Judith O'Donohoe, hired him "to pursue the signing of an affidavit for Leo Schultz." Pl. App. at 420. Koerber further testified:

(continued...)

not tell Sheriff Larsen that he had learned from Lewine Boucher-Goings's children that there was marijuana growing inside the farmhouse. Lewine Boucher-Goings's children did not talk to Schultz about any marijuana growing operation inside the farmhouse.[10]

### 2. *Sheriff Larsen reports to DHS and Chief Deputy Miller*

On September 8, 2004, Sheriff Larsen faxed DHS a report of suspected child abuse. Sheriff Larsen reminded DHS that, in 2002, it had investigated the welfare of Lewine Boucher-Goings's children and had issued a founded child abuse report. Sheriff Larsen told DHS that the children might be in danger again due to the resumption of marijuana growth at the Farmstead.

---

[9] (...continued)

> I went to [Schultz's] residence [on August 22, 2007] and spoke with him directly. . . . . [H]e would not sign the affidavit I was presenting. I read each line of the attached Affidavit of [Schultz], and paused after each numbered paragraph and asked [Schultz] if what I read was correct. He indicated after I read each paragraph that it was, in fact, true. However, when I asked him again to sign the affidavit[,] he refused.

*Id.* Paragraph 4 of the unsigned affidavit states: "There was no discussion [with a member of the Office in September of 2004] regarding any potential marijuana growing operation." *Id.* at 423. Again, Koerber's testimony about what Schultz said is inadmissible hearsay. Fed. R. Evid. 802.

[10] Lewine Boucher-Goings's son testified: "I never conversed with [Schultz] about any marijuana growing operation at our house, even back in 2002. Nor have I ever been present when my sister . . . had a supposed conversation with [Schultz] about any marijuana growing operation." Pl. App. at 390-91. Lewine Boucher-Goings's daughter testified:

> I have talked to [Schultz] occasionally if he was around our property since he owns property next to ours. The last time I had any conversation with him was in June or July of 2004 . . . . I do not remember what we talked about but it had nothing to do with marijuana.

*Id.* at 388.

11

Sheriff Larsen then made several additional statements to DHS. He told DHS that, on September 3, 2004, Schultz told him that (1) David Goings was recently fired from his job as a nurse at the Hospital; (2) David Goings was "mostly living" with another man in Waterloo; (3) Juanita Goings was having difficulty paying her electrical bills, because David Goings was using exorbitant amounts of electricity to grow marijuana in the basement of the farmhouse; (4) the smell of marijuana was very strong in the farmhouse and was making Lewine Boucher-Goings's children sick; and (5) David Goings would occasionally "come home" to tend to the marijuana plants and to smoke marijuana in his upstairs room. Def. App. at 126-27, 180.[11]

Sheriff Larsen then repeated all of the foregoing allegations to Chief Deputy Miller.

### 3.   *Investigator Troyna investigates*

#### a.   *At the DHS office*

DHS assigned Child Abuse Investigator Erika Troyna ("Investigator Troyna") to Sheriff Larsen's complaint. Investigator Troyna determined that the gravity of the allegations warranted a same-day investigation.

Investigator Troyna reviewed DHS's files and verified Sheriff Larsen's claim that there was a DHS investigation into the welfare of Lewine Boucher-Goings's children in 2002. She also verified that such investigation resulted in a founded child abuse report against David Goings and Lewine Boucher-Goings, in part due to the presence of a

---

[11] Sheriff Larsen testified that he made these additional statements to DHS. However, Sheriff Larsen testified that he was simply repeating claims that Schultz made to him. Sheriff Larsen claimed that Schultz told Sheriff Larsen that Schultz had recently received the underlying information from Lewine Boucher-Goings's children. When viewed in the light most favorable to Plaintiffs, however, a jury could find that Schultz never made these additional statements to Sheriff Larsen. Schultz and the children deny that the conversation took place.

The parties do not dispute, however, that a member of the Charles City Police Department informed Sheriff Larsen about the Pandering charge, including the mention of "weed" in David Goings's conversation with Stillions.

marijuana growing operation. Investigator Troyna decided to interview the children at their schools and then visit the Farmstead.

### b.    At the schools

Investigator Troyna visited with Lewine Boucher-Goings's children at their respective schools. The children denied that there was any illegal drug activity at the Farmstead.[12]

### c.    At the Farmstead

#### i.    Conversation outside the farmhouse

Because of a DHS safety regulation, Investigator Troyna asked Chief Deputy Miller to accompany her to the home visit. Chief Deputy Miller agreed. Investigator Troyna met Chief Deputy Miller, and they drove to the Farmstead. Upon arrival, Chief Deputy Miller recognized that a car parked near the farmhouse was David Goings's 1997 Pontiac TransAm. Chief Deputy Miller had participated in previous investigations at the Farmstead and was familiar with the Goings family.

Investigator Troyna and Chief Deputy Miller met Juanita Goings outside. Shortly thereafter, Lewine Boucher-Goings joined them.

Unbeknownst to everyone else, Chief Deputy Miller taped the foursome's conversation. A true and accurate transcript of such conversation is attached to the instant Order as "Court Exhibit 1."[13]

The conversation was cordial and brief.[14] Investigator Troyna and Chief Deputy

---

[12] Investigator Troyna testified that the children also told her that David Goings had moved out of the Farmstead in August of 2004. However, the children submitted affidavits, in which they denied making any such statements.

[13] Defendants did not provide the audiotape to the court. However, Plaintiffs do not dispute the accuracy or admissibility of the transcript.

[14] The entire conversation and subsequent search lasted less than one hour.

Miller introduced themselves, explained that they were investigating the welfare of Lewine Boucher-Goings's children and asked to search the Farmstead. Juanita Goings and Lewine Boucher-Goings verbally agreed to such a search. Juanita Goings also signed a written consent-to-search form. The form stated that Juanita Goings gave Chief Deputy Miller and Investigator Troyna permission to search the "physical address of 1266 270th Street, any and all outbuildings, garages, sheds, etc., [and] any and all vehicles on said premises at this time and date." Def. App. at 215. Lewine Boucher-Goings remained silent while her mother signed the consent-to-search form.

Before searching the Farmstead, Chief Deputy Miller asked Juanita Goings whether David Goings was present. As indicated, Chief Deputy Miller knew that David Goings had lived at the Farmstead and recognized that his car was present. Juanita Goings told Chief Deputy Miller that David Goings was not present. Investigator Troyna then asked Juanita Goings if David Goings was still living at the Farmstead. Juanita Goings told her that David Goings had moved to Waterloo.

Chief Deputy Miller then asked: "So [David Goings] has no say over this house, is that correct?" *Id.* at 191. Lewine Boucher-Goings responded "Nope." *Id.* Juanita Goings and Lewine Boucher-Goings assured Chief Deputy Miller and Investigator Troyna that David Goings had "no rights" to the residence, *id.* at 195, because David Goings had moved to Waterloo to live with Rice at least two to three months previously. They stated that David Goings's only remaining connections to the residence were: (1) every two or three weeks, David Goings would pick some vegetables from the family garden and (2) David Goings had left a box of personal items in an upstairs bedroom. When Chief Deputy Miller stated that he knew that David Goings once had a bedroom upstairs, Lewine Boucher-Goings responded "Yeah, and now it's my son's bedroom . . . . ." *Id.* at 196.

### ii. *Search of farmhouse*

Chief Deputy Miller and Investigator Troyna first searched the farmhouse. Chief

Deputy Miller eventually went into the upstairs bedroom that had belonged to David Goings in 2002. Chief Deputy Miller found clothing, video games and other items that appeared to belong to a juvenile. Chief Deputy Miller also found a pornographic magazine, a pornographic video entitled "Sex Shows: Oral Intercourse," a "Cannabis Culture" magazine, a small green lamp, a gym bag with adult clothing in it, some mail and a checkbook. The mail and the checkbook had David Goings's name on them. In Chief Deputy Miller's experience, the small green lamp was a kind of lamp commonly used to grow marijuana.

### iii.    Search of grounds

Chief Deputy Miller then searched the grounds. He found nothing of interest in the outbuildings on the Farmstead. Eventually, he discovered some manmade paths leading from the far southeastern portion of the Farmstead. Chief Deputy Miller continued to walk southward and saw what appeared to be a large plot of wild marijuana. The plot was located immediately south of an old white truck. Chief Deputy Miller inspected the marijuana and discovered that it had lots of buds, a feature that is atypical of wild marijuana.

Chief Deputy Miller returned to the farmhouse and asked Juanita Goings who owned the property where he found the marijuana. Juanita Goings told Chief Deputy Miller that the marijuana was on Schultz's property. Based on where Juanita Goings indicated the property line was, Chief Deputy Miller estimated that the marijuana was approximately one-hundred yards south of the Goings's property. Chief Deputy Miller told Juanita Goings that he would have to leave and obtain Schultz's permission to cut down and destroy the marijuana. Chief Deputy Miller also asked for and received Juanita Goings's permission to drive through the Farmstead to access the marijuana. Juanita Goings told Chief Deputy Miller that she was worried that she might have wild marijuana in her bean field. The bean field was located west of the farmhouse.

Before leaving the Farmstead, Chief Deputy Miller also informed Lewine Boucher-Goings that he had found pornography and a small green lamp in her son's bedroom. Chief Deputy Miller seized these items, and neither Juanita Goings nor Lewine Boucher-Goings objected.

Investigator Troyna and Chief Deputy Miller then left the Farmstead. Juanita Goings and Lewine Goings immediately called David Goings in Waterloo, in order to let him know what had happened. David Goings was not home. Juanita Goings left a message on his answering machine.

### d. Conclusion

On October 4, 2004, Investigator Troyna filed a report, in which she concluded that there was insufficient evidence to support a founded child abuse report as to David Goings or Lewine Boucher-Goings. Unlike 2002, DHS was unable to confirm the presence of a marijuana growing operation inside the farmhouse and any adverse attendant effects upon Lewine Boucher-Goings's children.

### 4. Chief Deputy Miller returns to destroy the marijuana on Schultz's property

After leaving the Farmstead, Chief Deputy Miller obtained permission from Schultz's wife to cut down and destroy any marijuana growing on their property. Chief Deputy Miller summoned a crew of fellow law enforcement officers to assist him. Three members of the Office drove to Schultz's property and began to cut down and destroy marijuana: Deputy Sheriff Dennis Sanders ("Deputy Sanders"), Deputy Sheriff Kevin Rieck ("Deputy Rieck") and Deputy Sheriff Reed Palo ("Deputy Palo"). Iowa Division of Narcotics Enforcement Special Agent Scott Green ("Special Agent Green") and City of Nashua Police Officer Paul Becthold ("Officer Becthold") also agreed to help.

While cutting down and destroying the marijuana plants on Schultz's property, the law enforcement officers wandered further to the south and found a cultivated marijuana growing operation. The officers found high quality marijuana plants in well-tended

buckets. The plants had been watered and placed in a mixture of potting soil and vermiculite. Someone had trimmed back the adjacent shrubbery, so that the marijuana would receive more sunlight for better growth.

The officers also discovered that someone had very recently pulled some of the plants from their pots. The pulled plants were found nearby but had not yet wilted. There were footprints in the adjacent softened soil.

The officers cut down and burned approximately 2,200 marijuana plants.

### 5. David Goings returns to the Farmstead

While Investigator Troyna and Deputy Chief Miller were searching the Farmstead, David Goings and Rice were working in Waterloo. When David Goings and Rice returned to 324 Summit Avenue, Waterloo, Iowa, they found Juanita Goings's message. David Goings immediately called his mother, and then Rice drove David Goings to the Farmstead.

When Rice dropped David Goings off at the Farmstead, David Goings could see law enforcement officers in the vicinity. David Goings went in the house. Worried that there was wild marijuana growing along a fence in her bean field, Juanita Goings ordered David Goings and Lewine Boucher-Goings's son to walk along a fence at the edge of the bean field, pull any wild marijuana plants and destroy them. David Goings and Lewine Boucher-Goings's son complied with Juanita Goings's orders.

### 6. David Goings is arrested

After about five minutes in the bean field, David Goings saw a police car drive at a high rate of speed from the southern part of the Farmstead to the farmhouse. Two law enforcement officers got out of the car and ran to the farmhouse. There was shouting at the door.[15] David Goings told his nephew to hide in a nearby barn, and his nephew

---

[15] Juanita Goings and Lewine Boucher-Goings testified that Deputy Palo and
(continued…)

complied.

Within minutes, David Goings was arrested. Juanita Goings and Lewine Boucher-Goings testified that they heard officers yelling at David Goings and saw them "roughly handling" him. David Goings testified as follows:

> [Officer Becthold] pointed a gun at me. I was fairly certain that I would be shot. I was scared that I would be shot, but at the insistence of the officer, I stood up and put my hands up. In the course of my arrest, [Officer] Becthold and officers from the [Office] tackled me to the ground and one of the officers kicked me in the ribs and someone called me a faggot. I do not know which one of the law enforcement officers kicked me or which one called me a faggot because my face was on the ground.

Pl. App. at 379.[16] Officer Becthold handcuffed David Goings. David Goings was dirty, smelled of marijuana and was wearing shoes that matched the footprints in the cultivated marijuana plot. The law enforcement officers seized David Goings's clothing and shoes as evidence.

Chief Deputy Miller read David Goings his *Miranda* rights. Chief Deputy Miller told David Goings that law enforcement officers had found marijuana. David Goings told Chief Deputy Miller that he was only pulling wild marijuana. He denied any knowledge of a cultivated marijuana growing operation and stated that there was only wild marijuana

---

[15](…continued)
Officer Becthold conducted a warrantless search of the farmhouse over their objections. However, their testimony is not included in Plaintiffs' "Response to Defendants' Statements of Material Facts Pursuant to Local Rule 56.1(b)2 [sic] and Statement of Plaintiffs' Additional Material Facts Pursuant to Local Rule 56.1(b)3 [sic]" (docket no. 41-2). Further, such search is not a part of the allegations in the Complaint. Accordingly, the court need not consider the legality of such search.

[16] Officer Becthold testified that David Goings "had his hands in his pockets, and I attempted to have him bring them up, and he refused to do that. And I assisted him back down to the ground." Def. App. at 287.

on the Farmstead.

### 7.    *David Goings is booked*

Sheriff Larsen personally booked David Goings into the Chickasaw County Jail. As a part of the booking process, David Goings told Sheriff Larsen that his current address was "324 Summit Avenue, Waterloo, Iowa." David Goings did not complain that he was in need of any medical treatment or that he had any medical problems. He did not complain of any discomfort associated with his arrest and did not appear to be injured.

## E.  State Court Proceedings

On September 9, 2004, David Goings appeared before a state magistrate judge. He verified under oath that his current mailing and residence address was "324 Summit Avenue, Waterloo, Iowa." He promised to notify the court of any change in his address, and the magistrate judge released him on bond.

On September 21, 2004, the Chickasaw County Attorney filed a two-count trial information on behalf of the State of Iowa against David Goings. Count 1 charged David Goings with Manufacturing Marijuana, in violation of Iowa Code section 124.401(1)(c)(5) (2003). Count 2 charged David Goings with Failing to Affix a Drug Tax Stamp, in violation of Iowa Code sections 453B.3 and 453B.12. David Goings later pled not guilty to both counts in the trial information. At the time of his plea, David Goings indicated that his address was "324 Summit Avenue, Waterloo, Iowa."

On November 17, 2004, David Goings filed a motion to suppress in the state court proceedings. He contended that law enforcement officers had illegally "seized items form [sic] [his] residence in Nashua, Iowa[,] and items from him personally." Def. App. at 250-51. He also argued that law enforcement officers had questioned him in a custodial setting without advising him of his *Miranda* rights. David Goings asked the state court to "suppress the statements and/or evidence as set forth above." *Id.* at 251. The State of Iowa resisted the motion to suppress.

On August 9, 2005, the state court held an evidentiary hearing on the motion to suppress. A number of witnesses, including Plaintiffs, testified under oath.

During their testimony, Lewine Boucher-Goings and Juanita Goings contradicted their September 8, 2004 unsworn statements to Investigator Troyna and Chief Deputy Miller. Lewine Boucher-Goings testified that David Goings had resided at the farmhouse continuously from 1994 until 2005; he had only periodically stayed with Rice in Waterloo; he had only recently vacated his bedroom; and her son was "just helping David clean that room up" at the time of the search. Def. App. at 305. Juanita Goings and Lewine Boucher-Goings each testified that, at the time of the search, David Goings maintained a garden in front of the farmhouse, stored items in the farmhouse and outbuildings and had mail sent to the Farmstead.

David Goings testified that he moved his residence to Waterloo shortly after his September of 2004 arrest.[17] He testified that, at the time of his arrest, he had a full-time job in Charles City, Iowa. He testified that the address on his 2004 federal income tax return was "1266 270th Street, Nashua, Iowa." He testified that he was registered to vote at "1266 270th Street, Nashua, Iowa" until he changed it to Waterloo in January of 2005. David Goings opined that the Farmstead was his "residence" on September 8, 2004, because he was living there and, indeed, had spent the previous night in his upstairs bedroom.

Neither party introduced into evidence Chief Deputy Miller's tape-recorded conversation with Investigator Troyna, Juanita Goings and Lewine Boucher-Goings on September 8, 2004.

At the conclusion of the hearing, David Goings's attorney, Ms. Judith O'Donohoe,

---

[17] Specifically, David Goings testified: "When I was released, I made the break with the Nashua fellows. I had to get out of the community, so I moved down to Waterloo full time." Def. App. at 98.

contended that Sheriff Larsen "fabricated an excuse and phoned it over to [DHS]" to "avoid the warrant process because they didn't have enough information to get a warrant in terms of probable cause." Def. App. at 320. She argued that any "consent" to search the property from Juanita Goings and Lewine Boucher-Goings was obtained under duress, because the officers indicated that, unless consent was given, the children would not be allowed to return home. She concluded that "everything from [the initial search] forward should be suppressed." *Id.*

On August 11, 2005, the state court granted in part and denied in part the motion to suppress. The state court suppressed all evidence found in the upstairs bedroom. The judge found that, although Juanita Goings voluntarily consented to the search,[18] *see* Def. App. at 327 n.2, David Goings was living in the bedroom and "had a reasonable expectation of privacy in that bedroom," *id.* at 326. The state court found that, although Chief Deputy Miller searched the room in "good faith," a good faith exception to the warrant requirement did not apply in Iowa state courts and any evidence found therein would be suppressed. *Id.* at 327 (citations omitted). The court denied the remainder of the motion to suppress. The state court held that the officers were fully justified in searching Schultz's property, because Chief Deputy Miller obtained permission to do so, as well as permission from Juanita Goings to drive across her property. Further, the state court found that the officers had probable cause to arrest David Goings, because he was found "shuffling in the beans," and therefore could search him incident to such arrest. *Id.* at 328. The state court denied David Goings's *Miranda* claim, because David Goings failed to present any evidence in support of it.

On September 12, 2005, David Goings filed an interlocutory appeal of the

---

[18] In her brief to the Iowa Supreme Court, Ms. Judith O'Donohoe repeatedly states that the state court judge found that Juanita Goings did not consent to the search of her house. *See* Def. App. at 385, 393.

suppression ruling. On May 4, 2006, the Iowa Supreme Court denied the appeal.

Sometime between May 4, 2006 and August 4, 2006, Ms. Judith O'Donohoe made a thinly veiled threat to the Chickasaw County Attorney to sue Chickasaw County if he did not drop the pending charges against David Goings. The Chickasaw County Attorney resisted the threat. Ms. Judith O'Donohoe testified:

> I verbally informed [the Chickasaw County Attorney] that[,] if he was interested, I could see if the Goings'[s] would release Chickasaw County from civil liability in exchange for dismissal of the criminal case against David Goings.

Pl. App. at 406-07. The Chickasaw County Attorney denied that anyone had violated the civil rights of Plaintiffs and, in the words of Ms. Judith O'Donohoe, "did not consider this to be adequate suggestion for a plea bargain." *Id.* at 407.

On August 4, 2006, Defendant and the Chickasaw County Attorney entered into a plea agreement. Pursuant to such agreement and with the state court's approval, the Chickasaw County Attorney amended Count 1 of the trial information and dismissed Count 2. As amended, Count 1 charged David Goings with Possession of Marijuana, in violation of Iowa Code section 124.401. David Goings waived his right to a jury trial and submitted to a trial on the minutes of testimony attached to the amended trial information.

On August 15, 2006, the state court found David Goings guilty. The state court found that David Goings possessed approximately 2,200 marijuana plants that law enforcement officers found on Schultz's property. In relevant part, the state court found:

> [T]he State [of Iowa] has established beyond a reasonable doubt that the defendant knowingly possessed marijuana knowing it was marijuana at the time. [D]efendant's statements that he claimed to be pulling up "wild" marijuana so that law enforcement wouldn't blame him is not credible. These marijuana plants, although located on the neighbor's farm, were well tended and groomed and a portion of them appeared to have been grown in pots before being transplanted. The presence of vermiculite supports that

conclusion.  The defendant's footprints were located around the marijuana plants and also led towards the Goings['s] residence a short distance from the marijuana plants.  The defendant's own statements that he was pulling the plants out is supported by the officers finding the plants freshly pulled and thrown in the brush.  The defendant was aware that officers were coming to the house and his actions appear consistent with an effort to destroy or conceal the marijuana that he was growing.  His actions in trying to evade the officers by crawling through a bean field provides reasonable inference that he knew his actions were illegal and he was trying to escape detection.  The lab report confirms that the marijuana plants were, in fact, marijuana and that there was marijuana on his person as well.  [T]he evidence establishes beyond a reasonable doubt that this is not wild marijuana but "cultivated" marijuana and that the defendant was the person who was cultivating the marijuana since his shoes matched those found at the site, the statements that he gave and the path leading from the Goings['s] residence through the vegetation to the marijuana site.

Def. App. at 334.  On September 12, 2006, the state court sentenced David Goings to twenty-eight days in jail, a $250.00 fine and one year of probation.

On October 11, 2006, David Goings appealed his conviction and sentence to the Iowa Supreme Court.  David Goings's appeal is still pending before the Iowa Supreme Court.  He served his twenty-eight-day jail sentence and paid his fine in late 2006.

## VI.  ARGUMENTS

In the Motion, Defendants present the court with a web of alternative and partially alternative arguments and request that the court dismiss the Complaint in its entirety.  The court first considers Defendants' judicial estoppel argument.  The court then considers Defendants' remaining arguments with respect to Count I, that is, Plaintiffs' § 1983 claims.  Finally, the court considers Defendant's remaining arguments with respect to Counts II, III and IV, that is, Plaintiffs' state law claims.

## VII.  JUDICIAL ESTOPPEL

As a threshold matter, Defendants argue that all of David Goings's claims should be dismissed pursuant to the "judicial estoppel doctrine."  Defendants point out that David Goings made materially false statements at the suppression hearing.  Specifically, David Goings falsely testified that (1) he had a full-time job in Charles City, Iowa on September 8, 2004; (2) he did not change his voting registration from the Farmstead to Waterloo until January of 2005; and (3) he filed his 2004 tax return with the Farmstead as his residence.  These false statements buttressed David Goings's claim that he was living in the upstairs bedroom of the Farmstead at the time of the search and had an expectation of privacy therein.  Defendants argue that David Goings should not be permitted to further profit from his lies in this court.

David Goings characterizes his false statements as mere innocent misrecollections.  Further, David Goings argues that the judicial estoppel doctrine does not apply here, because he has not changed his overall position.  He points out that his positions in his criminal case and this civil action are the same: namely, he was living in the upstairs bedroom of the Farmstead on September 8, 2004, and had an expectation of privacy therein.

The judicial estoppel doctrine "'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'"  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quoting *Pegram v. Herdich*, 530 U.S. 211, 227 n.8 (2000)).  Put simply, "'[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'"  *Id.* (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)).  The purpose of the judicial estoppel doctrine is "to protect the integrity of the judicial process by

prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* (citations and internal quotation marks omitted).

There is no rubric or settled formula for a court to apply when deciding whether to apply the doctrine of judicial estoppel. *Id.* Each case will likely turn on its own facts, and courts must not "establish inflexible prerequisites" before applying the doctrine. *Id.* at 751. Rather, the Supreme Court has identified four factors that will "typically" inform a decision to apply the judicial estoppel doctrine. *Id.* at 750. The Supreme Court stated:

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* at 750-51 (citations and internal quotation marks omitted).

David Goings clearly perjured himself in state court to avoid responsibility for his crime. No reasonable jury could find otherwise. Common experience teaches that an individual of sound mind does not completely forget within a year where he lived, where he worked full-time, where he was registered to vote *and* where he filed his tax returns. It is inherently incredible that David Goings would so soon forget that he was fired from his job of more than a decade because of a Pandering charge. David Goings's characterization of his lies as innocent misrecollections is beyond the pale, and the court may disregard such testimony in this summary judgment proceeding. *See, e.g., Ricci v. Alternative Energy Inc.*, 211 F.3d 157, 161 (1st Cir. 2000) ("Evidence presented on

summary judgment may be 'inherently incredible' and so disregarded.").

That said, the court declines to invoke the judicial estoppel doctrine to dismiss all of David Goings's claims. All three factors listed by the Supreme Court require or assume that the party against whom the judicial estoppel doctrine is invoked has asserted an *inconsistent position*. David Goings's position in the instant civil action is not inconsistent with his position in the criminal action. Throughout both proceedings, David Goings has consistently maintained that he had an expectation of privacy worthy of Fourth Amendment protection at the Farmstead on September 8, 2004. In other words, even though David Goings perjured himself in the state court proceedings, he did so to further precisely the same position that he asserts here. Accordingly, the judicial estoppel doctrine is inapplicable. *See, e.g., Hossaini v. W. Mo. Med. Ctr.*, 140 F.3d 1140, 1142 (8th Cir. 1998) ("The doctrine of judicial estoppel prohibits a party from taking *inconsistent positions* in the same or related litigation." (Emphasis added.)); *cf. New Hampshire*, 532 U.S. at 751-56 (applying doctrine of judicial estoppel, where a party offered inconsistent interpretations of "Middle of the River").

## VIII. COUNT I: PLAINTIFFS' § 1983 CLAIMS

### A. Summary of Argument

Defendants present the court with a number of partially overlapping arguments for dismissal of Count I, that is, Plaintiffs' § 1983 claims. First, Defendants argue that Plaintiffs' Unreasonable Search Claim and Unreasonable Seizure of Property Claim must be dismissed, because (1) Juanita Goings and Lewine Boucher-Goings voluntarily consented to the search of the Farmstead and (2) their voluntary consent was valid as to David Goings.[19] Second, Defendants argue that David Goings's Unreasonable Search

---

[19] Although Defendants conclude that "Plaintiffs have no Fourth Amendment Claims," Brief in Support of Motion (docket no. 24-4), at 11, Defendants do not discuss Plaintiffs' Unreasonable Seizure of Person Claim or Excessive Force Claim in connection

(continued...)

Claim and Unreasonable Seizure of Person Claim must be dismissed without prejudice pursuant to *Heck v. Humphrey*, 512 U.S. 475 (1994).[20]  Third, Sheriff Larsen and Chief Deputy Miller argue that they are entitled to qualified immunity on Plaintiffs' Unreasonable Search Claim.[21]  Fourth, Defendants claim that Plaintiffs' Unlawful Seizure of Personal Property Claim is "not cognizable," Brief in Support of Motion (docket no. 24-4), at 22, because Plaintiffs failed to avail themselves of a meaningful post-deprivation remedy.  To the extent necessary, the court shall consider these arguments, in turn.

### B.  Consent

Defendants argue that Plaintiffs' Unreasonable Search Claim and Unreasonable Seizure of Property Claim must be dismissed, because (1) Juanita Goings and Lewine Boucher-Goings repeatedly consented to the search of the Farmstead and (2) their consent was valid as to David Goings.  Plaintiffs respond that the consent of Juanita Goings and Lewine Boucher-Goings was not voluntary, because they "were expressly told that the search would be necessary in order to assure that the children were safe to return home, which is essentially saying that if there is no search the children will not return home."  Brief in Resistance (docket no. 41-3), at 27.  Plaintiffs do not respond to Defendants' argument that the consent of Juanita Goings and Lewine Boucher-Goings, if voluntary, was valid as to David Goings.

---

[19](...continued)
with their consent-to-search argument.

[20]  Although Defendants conclude that "[t]his case must be dismissed as to David [Goings]," Brief in Support of Motion (docket no. 24-4), at 8, they only discuss David Goings's Unreasonable Search Claim and Unreasonable Seizure of Person Claim in connection with this argument.

[21]  Defendants do not specify those portions of Count I to which they believe they are qualifiedly immune.  A fair reading of the Motion indicates that they only seek qualified immunity on Plaintiffs' Unreasonable Search Claim.

"Consent to search is a valid exception to the warrant requirement if the consent is knowingly and voluntarily given." *United States v. Uscanga-Ramirez*, 475 F.3d 1024, 1027 (8th Cir. 2007) (citations and internal quotation marks omitted). "Generally, 'the consent of one who possesses common authority over premises . . . is valid as against the absent, nonconsenting person with whom that authority is shared.'" *Id.* (quoting *United States v. Matlock*, 415 U.S. 164, 170 (1974)). Therefore, "[t]he Fourth Amendment's general prohibition against warrantless searches does not apply when officers obtain voluntary consent from the person whose property is searched or from a third party with common authority over the property." *United States v. Esparza*, 162 F.3d 978, 980 (8th Cir. 1998).

In order to determine whether consent was voluntary, the court must examine "whether, in light of the totality of the circumstances, consent was given without coercion, express or implied." *United States v. Sanders*, 424 F.3d 768, 773 (8th Cir. 2005). The court should consider the following characteristics of the person giving the consent: (1) age, (2) intelligence and education, (3) whether the person was under the influence of drugs or alcohol (4) whether the person was informed of the *Miranda* rights and (5) whether the person had experienced prior arrests and was thus aware of the protections the legal system affords suspected criminals. *Id.* (citing *United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990)). The court should also consider the environment in which the consent was secured. *Id.* Specifically, the court should consider: (1) the length of any detention, (2) whether the police "threatened, physically intimidated, or punished the suspect"; (3) whether the police lied or made promises; (4) whether the person was in custody when she consented; (5) whether the consent was obtained in public or private and (6) whether the person stood silent as the search occurred. *Id.* The court also should consider the person's "'contemporaneous reaction to the search'" and determine whether it "'was consistent with consent.'" *Id.* (quoting *United States v. Jones*, 254 F.3d 692, 696

(8th Cir. 2001)). None of the foregoing factors, however, is dispositive, and the court must not consider such factors rigidly or mechanically. *Id.* at 774.

Juanita Goings and Lewine Boucher-Goings have testified that they only agreed to the complete search of the Farmstead, because Investigator Troyna and Chief Deputy Miller explicitly threatened to take away Lewine Boucher-Goings's children. Ordinarily such testimony would be sufficient to survive summary judgment. The court is obliged to view the facts in the light most favorable to the nonmoving party and afford it all reasonable inferences, *Baer Gallery,* 450 F.3d at 820, and thus the court would ordinarily accept the testimony of Juanita Goings and Lewine Boucher-Goings at face value. Further, an explicit threat to a suspect's children usually renders involuntary any purported subsequent consent. *Cf. Lynum v. Illinois*, 372 U.S. 528, 534 (1963) (holding that a confession was coerced and not voluntary, where the suspect made the confession "only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate'); *United States v. Tingle*, 658 F.2d 1332, 1335-36 (9th Cir. 1981) (reaching the same conclusion in case involving less explicit threats, because "[t]he relationship between parent and child embodies a primordial and fundamental value of our society").

In the case at bar, however, the court has a transcript of an audiotape of the foursome's conversation that contradicts Plaintiffs' testimony. For example, Juanita Goings testified that Investigator Troyna explicitly threatened: "If we don't get to come in your house the children will be gone tonight." Pl. App. at 25. She also testified that Chief Deputy Miller indicated that "[Y]ou need[] to agree to a search of residence in order for your grandchildren to be returned." Def. App. at 316. Similarly, Lewine Boucher-Goings testified that Investigator Troyna said her children "would not be coming back that night if they did not look around." Def. App. at 41. The transcript proves that Investigator Troyna and Chief Deputy Miller never made these statements. Therefore, the

court must disregard Plaintiffs' testimony as to such statements. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 127 S. Ct. at 1776 (disregarding sworn statements in light of videotaped evidence to the contrary).

The transcript of the audio recording also makes clear that their consent was fully voluntary. No reasonable factfinder could conclude that Juanita Goings and Lewine Boucher-Goings did not voluntarily consent to a complete search of the Farmstead. Juanita Goings and Lewine Boucher-Goings are both adults. They do not assert that they were under the influence of drugs or alcohol. They appear sufficiently intelligent and educated to fully comprehend what was happening on September 8, 2004. Although they were not informed of their *Miranda* rights, they had prior interactions in 2001 and 2002 with law enforcement officers and DHS workers. They were not suspects and were not detained. They repeatedly consented to the search while they were in the relative familiarity of their own front yard, as opposed to the back of a police car or an interrogation room at a police station. They were not in a police-dominated atmosphere. The conversation was cordial and relatively brief.

It is true that Investigator Troyna and Chief Deputy Miller each mentioned that they wanted to ensure that the children had a safe place to which they could "come back." Def. App. at 192, 194. This does not, however, amount to an implicit threat that Lewine Boucher-Goings would lose custody of her children if she did not let Investigator Troyna and Chief Deputy Miller search the Farmstead. It does not render the consent of Lewine Boucher-Goings involuntary. *Cf. United States v. Syslo*, 303 F.3d 860, 866-67 (8th Cir. 2002) (holding that a defendant's confession was voluntary, even though the police placed her in a police-dominated atmosphere and her children were left with an unfamiliar caretaker). It is important to view the statements in context. Chief Deputy Miller

repeatedly stated that he was "not forcing [anyone] into anything" and he and Investigator Troyna were at the Farmstead "basically to make sure the kids are OK." Def. App. at 194.

The reaction of Juanita Goings and Lewine Boucher-Goings to the subsequent search is also consistent with voluntary consent. They actively cooperated with the search or stood silently as the search took place. Juanita Goings offered to show Chief Deputy Miller around the house and helped him find the light switch in the basement. Lewine Boucher-Goings testified that she "had no problems with them coming in the house and mak[ing] sure it was safe . . . ." *Id.* at 43.

In sum, the court holds that Juanita Goings and Lewine Boucher-Goings voluntarily consented to the search of the Farmstead. Because Plaintiffs do not dispute that such search was valid as to David Goings, the court shall dismiss with prejudice Plaintiffs' Unreasonable Search Claim and Unreasonable Seizure of Property Claim.[22] This ruling does not affect the remaining portions of Count 1, that is, David Goings's Unreasonable Seizure of Person Claim and Excessive Force Claim.

## C. Heck v. Humphrey

Defendants argue that David Goings's Unreasonable Seizure of Person Claim must be dismissed without prejudice pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994).[23]

---

[22] In any event, the transcript makes clear that, based upon the information available to them at the time, Investigator Troyna and Chief Deputy Miller reasonably believed that David Goings did not have an expectation of privacy at the Farmstead. Juanita Goings and Lewine Boucher-Goings repeatedly assured them that David Goings had moved out after he was fired from the Hospital. *See United States v. James*, 353 F.3d 606, 615 (8th Cir. 2003) ("On review, we ask this question: would the facts available to the officer at the time the consent is given warrant a person of reasonable caution in the belief that the consenting party had authority over the item to be searched?").

[23] The court need not analyze David Goings' Unreasonable Search Claim, because
(continued...)

In *Heck*, the Supreme Court held:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

512 U.S. at 486-87 (footnotes omitted). Defendants point out that (1) the state court rejected David Goings's argument that he was unlawfully seized; (2) his appeal is still pending; and (3) any damages award on David Going's Unreasonable Seizure of Person Claim in this court would necessarily render his conviction and sentence in state court invalid.

David Goings does not directly respond to Defendants' argument. Instead, he implicitly concedes it: he states that the *Heck* doctrine "would not be violated by the prosecution of [his state court] appeal as long as the appeal is reversed [sic]." Brief in Resistance (docket no. 41-3), at 18.

---

[23](...continued)
the court dismissed it in Part VIII.B, *supra*.

David Goings has not proven that "his conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." *Heck*, 512 U.S. at 486-87. Further, if Defendants arrested David Goings without probable cause on September 8, 2004, David Goings's state court conviction and sentence would be rendered invalid. Accordingly, the court shall dismiss David Goings's Unreasonable Seizure of Person Claim without prejudice.

This ruling does not affect the remaining portion of Count I, that is, David Goings's Excessive Force Claim. It is settled that an excessive force claim cannot fall within *Heck*'s purview. *See, e.g., Henson v. Brownlee*, 2 F.App'x 635, 637 (8th Cir. 2001) (reversing district court's dismissal of excessive force claim pursuant to *Heck*); *Huey v. Stine*, 230 F.3d 226, 230 (6th Cir. 2000) (holding that excessive force claims "do not run afoul of *Heck* because the question of the degree of force used by a police . . . officer is analytically distinct from the question of whether the plaintiff violated the law"), *abrogated on other grounds by Muhammad v. Close*, 540 U.S. 749, 754 (2004); *Figueroa v. Rivera*, 147 F.3d 77, 82 (1st Cir. 1998) (same).

### D. Remaining Arguments

Defendants argue that David Goings's Unreasonable Seizure of Property Claim should be dismissed with prejudice, because David Goings admitted in his deposition that (1) he does not want his seized property returned to him; (2) he has not availed himself of the procedure in Iowa Code section 809.3 (2007) for return of seized property; and (3) "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Ali v. Ramsdell*, 423 F.3d 810, 813-14 (8th Cir. 2005). Sheriff Larsen and Chief Deputy Miller also argue that they are entitled to qualified immunity as to the Unreasonable Search

Claim. In light of the court's previous rulings that the Unreasonable Seizure of Property Claim and Unreasonable Search Claim should be dismissed with prejudice, the court need not address these alternative arguments.

### E. Conclusion

The court shall dismiss with prejudice Plaintiffs' Unreasonable Search Claim and Unreasonable Seizure of Property Claim. The court shall dismiss without prejudice David Goings's Unreasonable Seizure of Person Claim. The only part of Count I that remains for trial is David Goings's Excessive Force Claim.

### IX. COUNTS II, III AND IV: PLAINTIFFS' STATE LAW CLAIMS

Defendants present the court with a number of partially overlapping arguments for dismissal of Counts II, III and IV. First, Defendants argue that Counts II, III and IV should be dismissed with prejudice, because Plaintiffs failed to comply with the notice provisions of Iowa Code section 670.5 (2003). Second, Defendants argue that they are immune from all liability on Counts II, III and IV, pursuant to Iowa Code section 232.73 (2003), because they were participating in, or assisting in good faith in, the making of a child abuse report. Third, Defendants argue that Count III should be dismissed with prejudice, because David Goings cannot prove the elements of false arrest under the Iowa common law. Fourth, Defendants argue that Count IV should be dismissed, because David Goings cannot prove the elements of malicious prosecution under the Iowa common law. To the extent necessary, the court considers each of these arguments in turn.

### A. Iowa Code § 670.5

Defendants argue that Counts II, III and IV must be dismissed, pursuant to Iowa Code section 670.5 (2003).

#### 1. Plain language

At all relevant times, Iowa Code section 670.5 provided in relevant part:

> Every person who claims damages from any municipality or
> any officer, employee or agent of a municipality for or on

34

account of any wrongful death, loss or injury within the scope of section 670.2 or section 670.8 or under common law shall commence an action therefor within six months, unless said person shall cause to be presented to the governing body of the municipality within sixty days after the alleged wrongful death, loss or injury a written notice stating the time, place, and circumstances thereof and the amount of compensation or other relief demanded. Failure to state time or place or circumstances or the amount of compensation or other relief demanded shall not invalidate the notice; providing, the claimant shall furnish full information within fifteen days after demand by the municipality. No action therefor shall be maintained unless such notice has been given and unless the action is commenced within two years after such notice.

Iowa Code § 670.5 (formerly Iowa Code § 613A.5).[24] Iowa Code section 670.5 is a notice-of-claim provision. Put simply, section 670.5 "requires a person claiming damages [against a municipality] to commence an action within six months after injury or cause a written notice to be presented to the local government within sixty days after injury." *Miller v. Boone County Hosp.*, 394 N.W.2d 776, 776 (Iowa 1986). Plaintiffs' claims against Defendants fall within the purview of this notice-of-claim statute, because a county is a "municipality" within the meaning of this section. Iowa Code § 670.1(2); *see, e.g., Farnum v. G.D. Searle & Co.*, 339 N.W.2d 392, 395 (Iowa 1983). Further, Counts II, III and IV are common law claims.

Under the plain terms of section 670.5, then, Plaintiffs were required to file the instant lawsuit within six months from September 8, 2004, or give written notice to the Chickasaw County Board of Supervisors within sixty days from September 8, 2004.

---

[24] In 2007, the Iowa General Assembly removed the timely notice requirement from Iowa Code section 670.5. *See* 2007 Iowa Legis. Serv. 110 (West), at § 5 ("2007 Act"). The 2007 Act was prospective and does not apply to this case. *See id.* at § 6 ("This Act applies to all complaints, claims, and actions arising out of an alleged death, loss, or injury occurring on or after July 1, 2007.").

Plaintiffs did neither. Accordingly, Plaintiffs' claims must be dismissed if the ordinary language of the statute is given full effect. Iowa Code § 670.5; *Argenta v. City of Newton*, 382 N.W.2d 457 (Iowa 1986) (affirming grant of summary judgment to municipality, where plaintiffs "had neither given the city written notice of their claims within sixty days nor commenced the court action within six months of the incident"), *overruled by Miller*, 394 N.W.2d at 781.

## 2.    *State court decisions*

Plaintiffs ask the court to ignore the plain language of section 670.5, because the Iowa Supreme Court has held that such statute is unconstitutional. In *Miller*, the Iowa Supreme Court held that Iowa Code section 670.5 offended equal protection, "because it creates an impermissible class: plaintiffs injured by local governments vis-a-vis plaintiffs injured by private tort-feasors." 394 N.W.2d at 779 (contrasting Iowa Code § 670.5 with Iowa Code § 614.1(2), which governs claims against private tort-feasors and does not contain a notice requirement). The Iowa Supreme Court "join[ed] those jurisdictions that have likewise concluded there is no rational basis for legislation like section [670.5]." *Id.* at 781 (citing *Reich v. State Hwy. Dep't*, 194 N.W.2d 700, 702 (Mich. 1972)[25]; *Turner v. Staggs*, 510 P.2d 879, 882 (Nev. 1973); *Hunter v. N. Mason High Sch.*, 539 P.2d 845, 850 (Wash. 1975); *O'Neil v. City of Parkersburg*, 237 S.E.2d 504, 508 (W.Va. 1977)).

In *Miller* and its progeny, the Iowa Supreme Court has "done surgery twice on section 670.5." *Perkins ex rel. Perkins v. Dallas Ctr.-Grimes Cmty. Sch. Dist.*, 727 N.W.2d 377, 379 (Iowa 2007). The Iowa Supreme Court recently summarized its decisions as follows:

> [In *Miller*,] we held the statute's requirement that a plaintiff commence an action within six months after injury unless notice was provided to the municipality within sixty days was

---

[25] Earlier this year, the Michigan Supreme Court abrogated *Reich*. *Rowland v. Washtenaw County Road Comm'n*, 731 N.W.2d 41, 48 (Mich. 2007).

. . . a denial of equal protection. *Miller*, 394 N.W.2d at 780. There, we said "because section 613A.5 [now 670.5] is unconstitutional, we hold that Iowa Code chapter 614 is the applicable statute of limitations for all actions arising under chapter 613A [now 670]." *Id.* at 781.

In a later case, we clarified that our *Miller* opinion struck down only the provision requiring commencement of an action within six months if notice is not given within sixty days. *Clark v. Miller*, 503 N.W.2d 422, 425 (Iowa 1993). In *Clark*, we held a plaintiff suing a municipality under chapter 670 still had the option of providing "timely notice" to the municipality. *Id.*; *see Perkins*[,] 727 N.W.2d at 381 (stating "[t]imely notice, we believe, means notice within a reasonable time after the injury"). Under such a scenario, the limitation for filing suit under chapter 670 is "two years after timely notice of the claim has been given." *Clark*, 503 N.W.2d at 425. If a plaintiff does not give timely notice of his claim to the municipality, then the applicable statute of limitations is found in chapter 614. *Miller*, 394 N.W.2d at 781. Iowa Code section 614.1(2) requires a plaintiff to file suit within two years from the date of injury.

*Rucker v. Humbolt Cmty. Sch. Dist.*, 737 N.W.2d 292, 294 (Iowa 2007) (bracketed text in original).

According to the Iowa Supreme Court, then, in order to satisfy equal protection principles, section 670.5 must be interpreted to allow plaintiffs suing local governments to pursue one of two avenues: (1) file the claim against the local government within two years from the date of the injury or (2) give timely notice to the governing body of the local government and then file the claim within two years from the date of such notice. *Id.* Plaintiffs conclude that Defendants' argument for dismissal under Iowa Code section 670.5 lacks merit, because they filed their lawsuit on September 8, 2006, exactly two years after their claims accrued on September 8, 2004. *See Rucker*, 737 N.W.2d at 294 ("If a plaintiff does not give timely notice of his claim to the municipality, then the applicable

statute of limitations is found in chapter 614.").

### 3. *Is Iowa Code section 670.5 constitutional?*

The principal problem with Plaintiffs' argument is that it ignores that this court is not bound by the Iowa Supreme Court's interpretation of the United States Constitution. *See, e.g., Collins v. Lockhart*, 771 F.2d 1580, 1583 (8th Cir. 1985) ("Collins is correct in asserting that this court is not bound by the Arkansas courts' conclusions regarding federal constitutional law."). The court respectfully disagrees with *Miller*, insofar as it holds that Iowa Code section 670.5 offends the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

### a. *Fourteenth Amendment*

The Fourteenth Amendment to the United States Constitution mandates that "[n]o State shall . . . deny to any person . . the equal protection of the laws." U.S. Const. Amend. XIV, § 1. Because the present case does not involve a suspect class or a fundamental right, the so-called rational basis test applies. *Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 107 (2003). Under the rational basis test,

> "[T]he Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational."

*Id.* (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 11-12 (1992) (citations omitted)).

The court holds that Iowa Code section 670.5 survives the rational-basis test. Considering a similar statute, the Tenth Circuit Court of Appeals wrote:

> Notice of claim provisions have been found to serve several legitimate state interests. Most commonly the statutes are said to allow: a prompt investigation while the evidence is still fresh; the opportunity to repair or remedy dangerous

conditions; quick and amicable settlement of meritorious claims; and preparation of fiscal planning to meet any possible liability. Other purposes include the discouragement of unfounded claims, minimizing the amount of damages and litigation costs, and allowing continued provision of local services and the maintenance of fiscal stability. These are legitimate government interests which conceivably promote the general welfare by ensuring the stability of government entities. Tort claims against the government have the potential to affect the orderly provision of necessary services to the general public. Given these factors, it cannot be said that the enactment of the notice requirement was an irrational means of pursuing legitimate state objectives. The requirement that tort victims give notice to the government . . . may serve to reduce spurious claims and to allow the government to prepare its defense. Such a provision may further ensure that the proper officials are notified of dangerous conditions and are aware of their duty to act.

* * * *

[T]here are real and vital differences between the situations of governmental units and private parties as potential tort defendants . . . . No private party has a tort responsibility comparable to the government unit's responsibility for injuries allegedly caused by defective or unsafe conditions of highways . . . . Taking into account the extent of the government unit's liability exposure where public ways and buildings are concerned, and of the difficulties in keeping in current touch with all those conditions that might become a source of liability, surely there is nothing constitutionally unreasonable about a notice requirement that is not applicable to other tortfeasors and other claimants.

The right to sue the government in [a state] is a right granted by statute. As such, the legislature may place reasonable restrictions on that right. The requirement that claimants give notice of their claim is a reasonable restriction that applies equally to all persons wishing to sue the government. We conclude that [the notice of claim statute] does not violate the Equal Protection Clause of the Fourteenth Amendment and may bar the plaintiff's claim . . . .

*Day v. Memorial Hosp. of Guymon*, 844 F.2d 728, 731-32 (10th Cir. 1988) (citations and internal quotation marks omitted); *Recreation World, Inc. v. Port Auth. of N.Y. and N.J.*, Nos. 96 Civ. 5549(LAP) and 97 Civ. 5029(LAP), 1998 WL 107362, *10 (S.D.N.Y. Mar. 9, 1998) (concluding that notice of claim provision did not offend the Fourteenth Amendment); *Miller*, 394 N.W.2d 781-85 (Wolle, J., dissenting) (stating that the majority had adopted a minority view); *see also Lacey v. Bekaert Steel Wire Corp.*, 799 F.2d 434, 436 (8th Cir. 1986) (holding that local government tort immunity scheme did not violate the rational-basis test). The court agrees with the Tenth Circuit Court of Appeals's analysis and adopts it in full. Having concluded that section 670.5 does not run afoul of the Fourteenth Amendment, the court concludes that the plain language of section 670.5 should be enforced and Plaintiffs claims are barred.

### b. No independent and adequate state grounds

It is true that the Iowa Supreme Court cited both the Fourteenth Amendment to the United States Constitution and Article I, Section 6 of the Iowa Constitution as the bases for its decision in *Miller*. Although "[t]he construction of a state constitution . . . is a matter of state law which rests with the Supreme Court of the state," *Kelley v. Swenson*, 481 F.2d 86, 89 (8th Cir. 1973), there is no indication in *Miller* that there were adequate and independent bases for the Iowa Supreme Court's decision.

> After [*Michigan v. Long*, 463 U.S. 1032, 1041 (1983)] a state court that wishes to look to federal law for guidance or as an alternative holding while still relying on an independent and adequate state ground can avoid the presumption [that the state court decision rests on federal grounds] by stating "clearly and expressly that [its decision] is . . . based on bona fide separate, adequate, and independent grounds."

*Coleman v. Thompson*, 501 U.S. 722, 733 (1991). *Miller* fails to satisfy the *Long* standard. The Iowa Supreme Court repeatedly referred to "equal protection" in general terms. *See Miller*, 394 N.W.2d at 777 (stating that the plaintiff argued that "the notice

40

requirement violates equal protection"); *id.* at 777 n.2 ("Because of our reasoning under equal protection . . . ."), 781 ("We, too, believe that the present has a right to govern itself. In our quest to seek the ill-defined parameters of the equal protection clause, we have reexamined the traditional interests put forth as justification for section [670.5], and have found them totally lacking in substance in today's circumstances."); *see also Rucker*, 737 N.W.2d at 294 (characterizing *Miller* as holding that section 670.5 is "a violation of equal protection"). The Iowa Supreme Court stated that the federal and state constitutional analyses were "similar," *Miller*, 394 N.W.2d at 778, collapsed the analyses into one analysis, *see id.* at 778-81, and applied the United States Supreme Court's familiar rational-basis test, *see id.* at 781. Therefore, the court presumes that the Iowa Supreme Court in *Miller* "decided the case the way it did because it believed that federal law required it to do so." *Long*, 463 U.S. at 1041; *see also id. at* 781 (Wolle, J, dissenting) ("I agree with the first two steps the majority takes . . . . The requirements of the state and federal equal protection clauses are in this instance the same and call for similar interpretation. Also, the traditional rational basis test . . . is the appropriate standard for us to apply.").[26]

### c. *Section 670.5 is constitutional*

Accordingly, the court holds that Iowa Code section 670.5 is constitutional and the

---

[26] *Rheuport v. Miller*, 819 F.2d 1459 (8th Cir. 1987) is instructive. After a verdict in favor of the plaintiff, the trial court in *Rheuport* had held that a portion of the plaintiff's claim was barred, because the plaintiff had not given notice under section 670.5. The Eighth Circuit Court of Appeals pointed out that, while *Rheuport* was on appeal, [in *Miller*] the Iowa Supreme Court had "ruled the . . . special notice provision unconstitutional on equal protection grounds." *Id.* at 1469. The Eighth Circuit Court of Appeals remanded for reconsideration in light of *Miller*. *Id.* The Court stated that "the trial court *may* find that the previous verdict as to [the defendant's] liability should be reinstated . . . ." *Id.* (emphasis added). In other words, the Eighth Circuit Court of Appeals, which was presumably aware that *Miller* was decided on federal and state equal protection grounds, did not view *Miller* as dispositive.

plain language of such statute controls. Plaintiffs were required to file the instant lawsuit within six months from September 8, 2004, or give written notice to the Chickasaw County Board of Supervisors within sixty days from September 8, 2004.

### 4.    *No substantial compliance*

Plaintiffs alternatively respond that, even if notice were required, Defendants should have known of their claims, in part because Attorney O'Donohoe approached the Chickasaw County Attorney in 2006 about a potential plea bargain. It is undisputed, however, that Plaintiffs did not give any written notice to the Chickasaw County Board of Supervisors. Substantial compliance with the statute is required. *See, e.g.*, *Goodwin v. City of Bloomfield*, 203 N.W.2d 582, 589 (Iowa 1973). A complete failure to provide written notice is not substantial compliance. In any event, O'Donohoe's offer of a plea bargain was oral, untimely and directed to the wrong person.

### 5.    *Conclusion*

Accordingly, the court shall dismiss Counts II, III and IV, because Plaintiffs failed to present notice of such claims to the Chickasaw County Board of Supervisors or file suit within six months from September 8, 2004. Iowa Code § 670.5.

## B.  Remaining Arguments

In light of the court's decision to dismiss Counts II, III and IV, the court need not address Plaintiffs' remaining arguments. In its discretion, however, the court shall briefly address whether there is sufficient evidence in the summary judgment record from which David Goings could prove Counts III and IV, David Goings's false arrest and malicious prosecution claims.[27]

### 1.    *False arrest*

In order to prove a claim of false arrest under Iowa common law, a plaintiff must

---

[27] The court declines to address Count II and Defendants' statutory immunity argument.

prove two elements: "(1) detention or restraint against one's will, and (2) unlawfulness of the detention or restraint." *Kraft v. City of Bettendorf*, 359 N.W.2d 466, 469 (Iowa 1984). A detention is not unlawful if the officer

> has reasonable ground for believing that an indictable public offense has been committed and has reasonable ground for believing that the person to be arrested has committed it. The issue presented thus becomes whether the arresting officers had reasonable ground for believing that [the plaintiff] had committed the offense [for which he was arrested]. The expression "reasonable ground" is equivalent to traditional probable cause.

> [T]o justify a warrantless arrest for a crime not committed in his presence, a police officer must allege and prove (1) that he in good faith believed that the person arrested had committed the crime, and (2) that his belief was reasonable. In considering these two matters, courts look to the facts within the officer's knowledge at the time the arrest was made.

*Id.* (citations and internal quotation marks omitted).

In the present case, the law enforcement officers who arrested and detained David Goings clearly had a reasonable ground for believing that an indictable public offense had been committed and had a reasonable ground for believing that David Goings had committed it. The court agrees with the reasoning of the state court, which denied David Goings's motion to suppress and found him guilty of Possession of Marijuana, in violation of Iowa Code section 124.401 (2003). The officers acted in good faith and had probable cause to arrest and detain David Goings, because he was found "shuffling in the beans" near a cultivated marijuana plot and was known to have manufactured marijuana in the recent past. Def. App. at 328.

Accordingly, even if the court had not dismissed Count III, that is, David Goings's false arrest claim, under Iowa Code section 670.5, the court would nonetheless hold that David Goings would be unable to prove such claim under the Iowa common law.

### 2.    *Malicious prosecution*

In order to prove a claim of malicious prosecution under Iowa common law, a plaintiff must prove six elements: "(1) a previous prosecution; (2) instigation of that prosecution by the defendant; (3) termination of the prosecution by acquittal or discharge of the plaintiff; (4) want of probable cause; (5) malice on the part of the defendant for bringing the prosecution; and (6) damage to the plaintiff." *Wilson v. Hayes*, 464 N.W.2d 250, 259 (Iowa 1990). As indicated in Part IX.B.1 *supra*, David Goings cannot show that he was arrested without probable cause. Further, as indicated in Part VIII.C. *supra*, David Goings's state court criminal proceedings have not "terminat[ed] . . . by acquittal or discharge . . . ." *Id.*

Accordingly, even if the court had not dismissed Count IV, that is, David Goings's malicious prosecution claim, under Iowa Code section 670.5, the court would nonetheless hold that David Goings would be unable to prove such claim under the Iowa common law.

## X.  DISPOSITION

The Motion (docket no. 24) is **GRANTED IN PART AND DENIED IN PART**. With respect to Count I, the court dismisses with prejudice Plaintiffs' Unreasonable Search Claim and Unreasonable Seizure of Property Claim. The court dismisses without prejudice David Goings' Unreasonable Seizure of Person Claim. The only part of Count I that remains for trial is David Goings's Excessive Force Claim. Counts II, III and IV are dismissed with prejudice.

For cause, the court shall extend the dispositive motions deadline and permit Defendants permission to file a second summary judgment motion on David Goings's Excessive Force Claim. Should Defendants choose to file such a motion, such motion should be filed **on or before February 1, 2008.**

**IT IS SO ORDERED.**

**DATED** this 6th day of December, 2007.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA